**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KATHY WATSON, | : | Civil No. 1:18-cv-01055 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, DEPARTMENT OF | : | |
| REVENUE, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

| | | |
|---|---|---|
| TIMOTHY SHELLEY, | : | Civil No. 1:18-cv-01352 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, DEPARTMENT OF | : | |
| REVENUE, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

In these consolidated actions, Plaintiffs, Kathy Watson ("Watson") and

Timothy Shelley ("Shelley"), each raise claims against their former employer,

Defendant, the Commonwealth of Pennsylvania, Department of Revenue (the

"Department"). The claims arise out of Plaintiffs' respective employment

terminations and overlap with respect to certain facts. Pending before the court are

the Department's motions for summary judgment, which the court will grant in full

in Watson's case and as to Counts I and II in Shelley's case. (Docs. 20, 22.) The

court, moreover, will decline to exercise supplemental jurisdiction over Shelley's state-law claim in Count III, resulting in its dismissal without prejudice.

## PROCEDURAL HISTORY

Watson filed her complaint on May 18, 2018.  (Doc. 1.)[1]  In the complaint, Watson asserts retaliation claims against the Department under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"). (*Id.* ¶¶ 52–59.)

On July 6, 2018, nearly two months after Watson filed her complaint, Shelley filed a complaint in a separate action.  (Doc. 1, 1:18-CV-01352.)  In his complaint, Shelley asserts claims against the Department for retaliation and interference pursuant to the Family Medical Leave Act ("FMLA").  (*Id.* ¶¶ 37–51.) Shelley also asserts a state-law claim for wrongful termination.  (*Id.* ¶¶ 52–55.)

The Department answered the complaints in both cases and pleaded affirmative defenses.  (Doc. 11; Doc. 5, 1:18-CV-01352.)  On September 3, 2019, after discovery closed and with the parties' agreement, the court consolidated the cases.  (Doc. 19.)  Subsequently, on October 1, 2019, the Department filed a motion for summary judgment with respect to each case.  (Docs. 20, 22.)  Since

---

[1] Unless otherwise indicated, all docket references relate to documents filed in the case docketed at 1:18-CV-01055.  Furthermore, where appropriate, the court will utilize the page numbers from the CM/ECF header.

then, the parties have fully briefed the motions, and they are ripe for review.  (*See* Docs. 21, 23, 28, 30, 34–38.)[2]

## FACTUAL BACKGROUND[3]

### A. The Watson Case

Watson, an African-American woman, began working for the Department in 1993.  (*See* Doc. 1, ¶ 20.)  During her employment, the Department promoted Watson to various positions.  (*Id.* ¶ 22.)  In January 2011, the Department promoted Watson to Chief of the Field Support Division.  (*Id.* ¶ 23; *see* Doc. 21, ¶ 1.)

#### 1.  Shelley Loaned Watson $15,000

As a Department employee, Watson was familiar with the Department's Employee Handbook.  (Doc. 21, ¶ 2.)  She also understood that a conflict of interest existed when her interests conflicted with that of the Department and that, in her job, she had to make decisions about such conflicts.  (*Id.* ¶¶ 3–4.)  Although she may not have recognized it at the time, in July 2015, Watson became embroiled in a conflict of interest.

---

[2] Included among the various filings are two copies of Shelley's "Counterstatement of Material Facts" and two copies of Watson's brief in opposition.  (Docs. 34-2, 35, 36, & 36-2.)  It is unclear to the court why duplicate copies of these documents were filed.

[3] In this section, the court relates disputed and undisputed assertions.  When the court relates disputed assertions, it does so consistent with the standard of review, *infra*.

Watson asked for and received two personal loans from Shelley, her subordinate. (*See* Doc. 1, ¶ 25; Doc. 21, ¶ 9.) The loans were given to Watson for use by her son, Corey Ford ("Ford"), in his criminal proceedings. (*See* Doc. 23-1, pp. 61–62.) Ford, who personally knew Shelley, called Shelley from jail expressing discontent with his court-appointed defense attorney. (*Id.* at 61.) After that phone call, Shelley and Watson discussed the situation, and Watson "asked [Shelley] if [he] could lend [Ford] some money." (*Id.* at 62.) Shelley loaned Watson a total of $15,000 to help Ford. (Doc. 1, ¶ 25.)

At the time, Shelley also worked for the Department and was Watson's direct subordinate. (Doc. 21, ¶ 9.) Although she initially viewed the loans as a personal favor, Watson has since admitted that she did not exercise good judgment when she accepted the money. (*Id.* ¶ 21; Doc. 21-1, p. 49.) Indeed, she has never heard of a supervisor taking a loan from a subordinate. (Doc. 21, ¶ 20.) Furthermore, before taking the loans, Watson did not talk to anyone to discuss whether it was appropriate. And, for calendar year 2015, Watson failed to report the loans on her State Ethics Commission Statement of Financial Interests and Governor's Code of Conduct Statement of Financial Interests forms. (*Id.* ¶¶ 18, 45–46; Doc. 28-1, p. 100.)

### 2. Upon Discovery Of Shelley's Loans To Watson, The Office Of Inspector General Initiated An Investigation

In October 2016, Jane Baldo ("Baldo"), an employee in the Labor Relations Division, saw Shelley in the parking garage "at his quit time." (Doc. 28-1, p. 15.)[4] In Baldo's mind, that would have required Shelley to leave his desk before he was actually permitted to leave for the day. (*Id.*) Moreover, Baldo was aware that Shelley "had some issues with time and attendance." (*Id.*) Baldo subsequently called her own subordinate within the Labor Relations Division, Tracy Sullivan ("Sullivan"), to determine whether Shelley should have been away from the office when Baldo saw him. (*Id.*) In turn, Sullivan reached out to Watson.

The next day, Baldo received an e-mail regarding the reason for Shelley's early departure from work. (*Id.*) That e-mail was addressed from Shelley to Watson's personal e-mail address. (*Id.*) Because the e-mail was addressed to Watson at her personal e-mail address, which Baldo found strange, a review of Shelley's e-mail records was requested and completed. (*Id.*)

During the review of Shelley's e-mail records, loan documents were discovered. (*See id.*; Doc. 1, ¶ 42.) The documents showed Watson's name and identified that Shelley had loaned Watson a total of $15,000. (*Id.*) On November

---

[4] Certain facts relied on by the Department in the supporting briefs do not appear in the statements of facts that accompany the motions for summary judgment. The court could ignore those facts or treat them as disputed. But because the Department provides citations to relevant portions of the record on the docket, and Watson had the opportunity to refute or object to the same, the court will consider the briefed facts in this instance.

2, 2016, the matter was referred to the Office of Inspector General for further investigation.  (*See* Doc. 28-1, p. 98.)

### 3.  Watson Complained About Bonnie Kabonick ("Kabonick")

On December 19, 2016, after the above matter was referred to the Office of Inspector General for investigation, Watson complained to Baldo and Sullivan about her (Watson's) supervisor, Kabonick.  (Doc. 1, ¶ 30.)[5]  Watson believed that Kabonick was engaging in racially-discriminatory behavior and creating a hostile work environment.  (*Id.*)

Specifically, Watson explained that, in December 2016, another African-American employee requested a new calculator, but was told to make a formal request for one when, just two months earlier, a Caucasian employee ordered a new calculator and was provided one without any issue.  (*Id.* ¶¶ 31–32.)  Watson also explained that Kabonick was adamant about disciplining an African-American employee for being a mere minutes late, but did not punish, much less terminate the employment of Jennifer Chort ("Chort"), a Caucasian supervisor, who was regularly 30 minutes late to work.  (*Id.* ¶¶ 33–35.)

In addition, during a dispute between the two women, Kabonick remarked to Watson that she (Kabonick) had never worked with anyone "like you."  (Doc. 21-

---

[5] It is unclear whether Watson was aware of the Inspector General's involvement when she made these complaints.

1, pp. 54–56.)  Watson viewed the phrase as racially motivated.  (*Id.* at 54.)

Kabonick, moreover, would only keep the door open during meetings with

Watson.  (*See id.* at 62.)  On one occasion, while they were meeting in Kabonick's

office, a plant came crashing down.  (*Id.*)  Kabonick yelled out that Watson did not

hit her.  (*Id.*)

Watson further claims in this case that:

- She was given the most employees to supervise simply because she was the only African-American supervisor working for the Department;

- Karbonick would dump work on her because she (Watson) was the only African-American supervisor;

- Kabonick and/or Director Tom Scott ("Scott") would purchase birthday cakes and cards for Chort, but not for her;

- Kabonick questioned Watson about complying with a subpoena;

- She was not given a work iPhone as a management-level employee; and,

- Chort once told Watson that she (Chort) had falsified time records, but Chort was not terminated from her employment.

(*See* Doc. 21 ¶¶ 30, 33–34; Doc. 21-1, pp. 65–68, 91–93.)  Of course, it is unclear

whether these particular issues were explained to Baldo and/or Sullivan.  For

purposes of the pending motion, the court will infer that they were.

On December 20, 2016, the day after meeting with Baldo and Sullivan,

Watson met with Theresa Haag ("Haag"), a Human Resource Analyst, about her

complaints.  (Doc. 1, ¶ 37; Doc. 21-1, p. 87.)  Haag provided Watson with "EEO

intake forms," which Watson eventually filled out and returned. (Doc. 1, ¶¶ 38–39; Doc. 21-1, p. 87.) Watson and Haag also had an extended conversation about the nature of Watson's complaints. (Doc. 21-1, pp. 87–88.) On January 4, 2017, Haag informed Watson that the Department would not investigate her complaints because Watson was unable to inform Haag who had been treated differently than her in the same circumstance. (Doc. 1, ¶ 40; Doc. 21-1, p. 88.)

### 4. The Inspector General Interviewed Watson About The Loans From Shelley

In February 2017, Scott, the acting Director of the Department, brought Watson into a conference room to meet with Nina Klein ("Klein"), a Special Investigator with the Office of Inspector General. (Doc. 1, ¶ 41; *see* Doc. 28-1, p. 99.) During the meeting, Watson told Klein that she had in fact received loans from Shelley and that the loans were for her son. (Doc. 1, ¶ 44; *see* Doc. 28-1, p. 99.) Watson also conveyed that the transactions occurred entirely outside of work and between friends. (*See* Doc. 1, ¶ 45; Doc. 28-1, p. 100.)

### 5. Watson Was Terminated From Employment With The Department

On March 1, 2017, Scott asked Watson to meet with Baldo and Sullivan. (Doc. 1, ¶ 46.) During the meeting, Baldo and Sullivan pressed Watson about the money that Shelley loaned her. (*Id.* ¶ 47.) Watson told them the truth about the

loans.  (*Id.* ¶ 48.)  She also expressed that her son and Shelley had a close personal relationship.  (*Id.* ¶ 49.)

Baldo and Sullivan subsequently recommended that Watson's employment be terminated.  (*See* Doc. 21-2, p. 4; Doc. 28-1, p. 18; Doc. 28-2.)  The recommendation was based on information learned from the Inspector General's Office.  (*See* Doc. 28-1, pp. 17–18, 97.)  The acting Secretary of Revenue, Elieen McNulty, then finalized Watson's employment termination.  (Doc. 28-2; *see* Doc. 21-2, p. 4.)

Watson has not directed the court to evidence demonstrating that Secretary McNulty was aware of Watson's prior complaints about Kabonick.  Also, Kabonic was not involved in the decision to terminate Watson's employment.  (Doc. 21, ¶ 23.)  And, Watson has not directed the court to evidence demonstrating that she complained that anyone other than Kabonic (and possibly Scott) engaged in racially-discriminatory conduct toward her or others in the Department.  (*See also* Doc. 21, ¶¶ 22, 32.)  Nor is the court aware of evidence suggesting that Watson faced antagonism or animosity after making her complaints.

### 6.  The Inspector General Issued An Investigative Report

On March 29, 2017, after the termination decision had been made, the Inspector General issued an investigative report to Secretary McNulty.  (Doc. 28-1, 98.)  In sum, based on the loan that Watson accepted from her subordinate,

Shelley, the Inspector General found that Watson: (1) violated provisions of the Governor's Code of Conduct; (2) violated provisions of the Public Officials and Employee Ethics Act; (3) engaged in conduct in violation of Commonwealth Personnel Rules; and (4) engaged in conduct discouraged by Revenue Standards of Conduct. (*Id.* at 99.) The report also referenced the fact that Shelley had made loans to two other employees of the Department. (*See id.*) While one of those employees was a supervisor with the Department, neither employee supervised Shelley. (Doc. 21, ¶ 42; Doc. 35-1, ¶ 42.)

### 7.  Watson Pursued Administrative Relief

On April 12, 2017, Watson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 1, ¶ 13; *see* Doc. 21-2, p. 142.) The charge was dual filed with the Pennsylvania Human Relations Commission. (Doc. 1, ¶ 14.) On February 16, 2018, the EEOC issued Watson a right-to-sue letter. (*Id.* ¶ 15.) Watson subsequently filed her complaint in this action. (Doc. 1.)

### B.  The Shelley Case[6]

In March 1999, the Department hired Shelley as a Taxpayer Account Technician. (Doc. 1, ¶ 8; Doc. 36-2, ¶ 1.) Shelley was eventually promoted to the position of Taxpayer Program Specialist and remained in that position until his

---

[6] In this section, all citations to "Doc. 1" refer to the complaint that Shelley filed in case number 1:18-cv-01352.

employment was terminated in 2017.  (Doc. 1, ¶ 10; Doc. 36-2, ¶ 2.)  In that role, Shelley worked as an at-will employee.  (Doc. 1, ¶ 53.)

As an at-will employee of the Department, Shelley was familiar with the Commonwealth of Pennsylvania Employee Handbook.  (Doc. 23, ¶ 2.)  Shelley further understood the concept of conflicts of interest while working for the Commonwealth.  (*Id.* ¶ 3.)  In addition, Shelley, who was questioned in 2005 about his internet usage, but not disciplined, was aware that extended personal use of the internet at work was against Commonwealth policy.  (*See id.* ¶¶ 4–5; Doc. 23-1, pp. 29–30, 32.)

## 1. Shelley Loaned Money To Department Employees, Including Watson

At various times throughout his employment, Shelley loaned money to three employees working for the Department.  (Doc. 36-2, ¶ 8.)  In Shelley's mind, he was simply loaning money to friends.  (*See id.* ¶¶ 8–9, 13–15.)  In 2015, however, Shelley loaned $15,000 to Watson.  (Doc. 1, ¶¶ 12, 53; Doc. 23, ¶¶ 10–11, 13; Doc. 36-2, ¶ 24.)  At the time, Shelley was also working as Watson's subordinate. The loans were to help Watson afford an attorney in her son's criminal case.  (Doc. 1, ¶¶ 12, 53; Doc. 23, ¶ 9; Doc. 36-2, ¶ 17.)  Shelley was personally familiar with Watson's son, Ford.  (Doc. 36-2, ¶ 18.)  And it was Ford's initial contact with Shelley that led Watson to ask Shelley for the money.  (*Id.* ¶¶ 19–21.)

### 2.   Upon Discovery Of Shelley's Loans To Watson, The Office of Inspector General Launched An Investigation

As described above, at the end of 2016, the Department, via the Office of Inspector General, opened an investigation into the loans that Shelley made to Watson – his supervisor – and other employees.  Again, aside from Watson, the other two employees did not supervise Shelley at work.

### 3.   Watson Served A Subpoena To Shelley To Testify At Her Unemployment Compensation Hearing

On March 1, 2017, upon completion of the Inspector General investigation, discussed *supra*, Watson was terminated from her employment with the Department.  (Doc. 1, ¶ 19.)  On the same day, Watson called Shelley to let him know.  (Doc. 23, ¶ 21.)  Thereafter, on or about April 17, 2017, Watson personally served Shelley at work with a subpoena to testify at her unemployment compensation hearing.  (Doc. 36-2, ¶ 26.)  In response, Shelley left a note in Kabonick's office to inform her about the subpoena.  (Doc. 23-1, pp. 83, 99.)

On April 18, 2017, the day of the hearing, when Shelley arrived to work, Kabonick issued Shelley a notice for a pre-disciplinary conference to be held on April 19, 2017.  (Doc. 1, ¶ 23; Doc. 36-2, ¶ 28; *see* Doc. 23-1, p. 83.)  According to the notice, the conference related to allegations that Shelley sent excessive e-mails, engaged in non-work related activities during working hours, issued loans in

excess of the legal interest rate, and failed to disclose loans that he had issued. (Doc. 1, ¶ 24.)  Afterwards, Shelley proceeded to testify at Watson's hearing.

The next day, April 19, 2017, the pre-disciplinary conference occurred. During the conference, Shelley met with Baldo and Sullivan to discuss the topics in the notice, including the loans he had given to coworkers.  (Doc. 1, ¶ 26; Doc 23, ¶¶ 17–18.)  At the conclusion of the meeting, Baldo told Shelley that the Department would be continuing an investigation.  (Doc. 1, ¶ 27.)

### 4.  Shelley Applied For FMLA Benefits

On May 8, 2017, Shelley requested FMLA leave paperwork from Human Resources.  (Doc. 23-1, p. 102.)  The next day, Shelley was diagnosed with depression by his physician, Dr. Moody, who also completed the healthcare certification section on the FMLA application.  (*Id.*)  Dr. Moody subsequently faxed the FMLA paperwork to the Department's Human Resources division. (Doc. 36-2, ¶ 33.)

Upon learning that Dr. Moody had faxed the necessary FMLA paperwork to the Department, Shelley met with Allison Cost ("Cost"), the Department's FMLA Coordinator.  (Doc. 36-2, ¶ 34.)  Cost told Shelley that everything looked great.  *Id.*

### 5.  Shelley Was Terminated From Employment With The Department

On May 9, 2017, an hour-and-a-half after Shelley met with Cost, Scott asked Shelley to meet in a conference room.  (*See* Doc. 1, ¶ 33; Doc. 23-1, p. 106.)

During the meeting, Scott told Shelley that he was terminated from his employment with the Department. (Doc. 1, ¶ 34; *see* Doc. 36-2, ¶ 36.) Scott further gave Shelley a termination letter signed by the acting Secretary of Revenue, Daniel Hassell. (Doc. 1, ¶ 34.) The termination letter stated that Shelley was terminated from employment with the Department based on the allegations listed in the notice for the pre-disciplinary conference and for Shelley's failure to file and/or pay state income tax returns appropriately. (*Id.* ¶ 35.)

Other than timing, Shelley admits that he has no evidence that the FMLA application he submitted or his attendance and testimony at Watson's unemployment compensation hearing caused his termination of employment. (Doc. 23, ¶¶ 25–26.) However, Shelley posits that a later audit revealed that, for 2016, he had in fact filed and paid his Pennsylvania income tax returns properly. (See Doc. 23-1, p. 110.) Also, Shelley clarified that any personal internet use he engaged in occurred on breaks, during lunch, or after he had already finished work-related assignments. (Doc. 36-2, ¶ 4.) In other words, the personal usage was permissible, even under the Department's policy. (*See id.* ¶ 5.)

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of

the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Critically, the court is not required to go on a fishing expedition in search of relevant evidence. The court is only required to consider the evidence that the parties cite in their summary-judgment filings. Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### A. The Watson Case

In the Watson case, the only theory of liability is retaliation. Where, as here, direct evidence of retaliation is absent, the court utilizes the *McDonnell-Douglas* framework. Furthermore, the court will rely on the same analysis for both the Title VII and PHRA claims. *See, e.g.*, *Summy-Long v. Pa. State Univ.*, 226 F. Supp. 3d 371, 416 n.288 (M.D. Pa. 2016) (citing *Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 387 (E.D. Pa. 2007)) (relying on the same analysis to award summary judgment on Title VII and PHRA retaliation claims).[7]

First, Watson must establish a *prima facie* case of retaliation. To do so, Watson must show that: (1) she was engaged in a protected activity; (2) the Department took an adverse employment action against her; and (3) there exists a causal connection between her protected activity and the Department's adverse action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citation omitted). Second, upon a successful showing of a *prima facie* case, the burden of production of evidence will shift to the Department "to present a legitimate, non-retaliatory reason for having taken the adverse action." *Boykins v. SEPTA*, 772 F. App'x 148, 156 (3d Cir. 2018) (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181,

---

[7] It is questionable whether the Department has immunity from suit on the PHRA claim. If so, the claim would be subject to dismissal. *See, e.g.*, *Dieffenbach v. Dep't of Rev.*, 490 F. App'x 433, 434 (3d Cir. 2012) (affirming dismissal of PHRA retaliation claim on immunity grounds). The Department, however, has not briefed this issue.

193 (3d Cir. 2015)).  Third, if the Department satisfies its burden, the burden will then shift back to Watson "to demonstrate that 'the [Department's] proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Id.* (quoting *Daniels*, 776 F.3d at 193 (internal citation omitted)).

Here, the Department does not contest that Watson engaged in a protected activity (complaining about racial discrimination) or that adverse action (termination from employment) was taken against her.  (*See* Doc. 28, p. 8.)  The Department, instead, argues that Watson cannot establish a *prima facie* case of retaliation because she cannot show causation.  (*Id.* at 7, 8–10.)  To that end, the Department points out that the investigation which led to Watson's employment termination was not only initiated before she ever raised the complaints about Kabonick, but the investigation also involved conduct by Watson that took place prior to the same complaints.  (*See id.* at 8, 10.)  The Department further insists that Watson's termination was due to the conflict of interest originating from her acceptance of loans from Shelley, and that Secretary McNulty, who had the power to terminate Watson's employment, was unaware of Watson's complaints about Kabonick.  (*See id.* at 2, 8, 10.)

In opposition, Watson does not address whether Secretary McNulty was aware of her complaints.  (Doc. 36.)  Rather, Watson focuses on the temporal

proximity between the date that her employment was terminated and the date that she complained to Baldo and Sullivan about Kabonick. (*Id.* at 6–7.) Watson further asserts that: (1) in her lengthy career with the Department she had never been subject to discipline; (2) the two other employees who accepted loans from Shelley were not terminated from employment; and (3) Chort was not fired despite her arguably more serious conduct in falsifying records. (*Id.* at 7–8.)

The analysis in this case logically begins with the causation element. To satisfy the causation element, a claimant must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). In other words, it must be established that the "protected activity was a but-for cause of the alleged adverse action." *Id.* at 362.

To meet that standard, plaintiffs may rely on "a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Indeed, plaintiffs may rely on timing, antagonism, inconsistent reasons for a termination decision, and "other evidence gleaned from the record as a whole from which causation can be inferred." *Id.* at 280–81. Also relevant to the analysis is whether employment-related issues are documented or occurred prior to the protected activity, and whether the individuals responsible for the adverse action knew of the

plaintiff's protected conduct at the time that the individuals acted. *See Harrison-Harper v. Nike Inc.*, 788 F. App'x 846, 849 (3d Cir. 2019).

With respect to timing, such evidence alone "ordinarily is insufficient to demonstrate a causal link unless the timing is 'unusually suggestive' of retaliatory motive." *McLaughlin v. Fisher*, 277 F. App'x 207, 218 (3d Cir. 2008) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (internal citation omitted)). By way of example, the Third Circuit has "held two days between a protected activity and an adverse action is 'unusually suggestive' . . . but that three months is not[.]" *Id.* (citing *Krouse*, 126 F.3d at 503 (internal citation omitted); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)).

In this case, the timing between the protected conduct and adverse action is not unusually suggestive of a causal nexus. Nor is the timing, alone, enough to otherwise permit an inference of causation. The evidence to which the parties have directed the court does not demonstrate that Watson received inconsistent reasons for her termination from employment or that she was subject to any antagonism following her complaints about Kabonick. In fact, Watson does not point to evidence to demonstrate or permit an inference that either Baldo or Sullivan, who recommended that Watson be terminated from employment, acted with any animus toward her. In fact, the evidence identified by the parties demonstrates that Watson's conduct in accepting the loans from her subordinate had already occurred

and was reported to the Office of Inspector General for investigation at least one month prior to Watson's complaints about Kabonick.  And the result of the Inspector General's investigation, which Watson does not challenge or otherwise dispute, certainly served as a legitimate basis for Watson's termination from employment.  (*See* Doc. 28-2, p. 2.)

In addition to the foregoing, the Department has directed the court to evidence in the record demonstrating that Secretary McNulty had the ultimate decision-making authority regarding Watson's termination from employment.  (*See* Doc. 21-2, p. 4; Doc. 28-2, p. 2.)  Watson does dispute that evidence.  Watson also has not pointed the court to evidence that would permit an inference that Secretary McNulty was aware of Watson's complaints about Kabonick when she terminated Watson from her employment with the Department.

Moreover, the court is unaware of evidence in this case that would suggest that Baldo and Sullivan had animus toward Watson or that any such animus (assuming it existed) translated into retaliatory action.  Likewise, the court is unaware of evidence to suggest that animus or a desire to retaliate informed their recommendation that Watson be terminated from employment.  Thus, assuming she asserted the argument, Watson could not even prevail under a "cat's paw" theory.  *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1, 421 (2011) (addressing the circumstances under which an employer may be held liable for employment

discrimination based on the animus of an employee who influenced, but did not make, the ultimate employment decision).

As stated above, Watson argues that two other employees accepted loans from Shelley and were not terminated.  But Watson fails to appreciate that neither employee supervised Shelley, which undercuts the comparison since the Department contends that Watson was terminated for accepting a loan from her subordinate.  In a similar vein, Watson does not point to evidence to demonstrate (or permit an inference) that Baldo, Sullivan, and/or Secretary McNulty: (1) knew about or were aware of Chort's purported falsification of records; and (2) were involved in any part of any disciplinary matter relating to the same.  Without such evidence, including additional details surrounding the purported activity that Chort engaged in, no reasonable juror could conclude that Chort was treated more favorably than Watson.  On the current minimal evidence, *see* Doc. 21-1, pp. 91–92,[8] a reasonable juror could only reach that conclusion by speculating.  Lastly, the

---

[8]     Q. You mentioned that somebody got in trouble because they had falsified their time records.  Do you – do you know about that or did you hear that through the grapevine?

[Watson].  I know Jen Chort was one of those.

Q. Did she admit it or how is it you found out?

[Watson].  To me, she did.  Yes.

Q. How much time was involved?

[Watson].  I don't recall.

simple fact that Watson might not have been subject to discipline prior to her termination constitutes a mere "scintilla" of evidence in comparison to the unchallenged and serious findings of the Inspector General that served as the basis for the termination of Watson's employment.

In short, no reasonable juror could find Watson's complaints about Kabonick were the "but for" cause of her termination. As a result, Watson has not established a *prima facie* case of retaliation. The court need not proceed any further with analysis of the *McDonnell-Douglas* framework. The Department is entitled to summary judgment on the Title VII and PHRA claims.

### B. The Shelley Case

#### 1. The FMLA Claims

Shelley asserts retaliation and interference claims relating to his FMLA rights. The claims are intertwined in that they both turn on the Department's decision to terminate Shelley's employment after he applied for FMLA benefits. Because of this, the court will analyze the claims together under the retaliation model. *See Lichtenstein*, 691 F.3d at 312 n.25 (noting that "several federal courts of appeals have affirmed dismissal of interference claims that . . . were duplicative of the plaintiffs' retaliation claims.") (citations omitted); *see also Atchison v. Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) ("[Plaintiff's] interference claim is identical to his retaliation claim, and premised on the same allegation . . . . He

cannot escape the *McDonnell Douglas* analysis to prove his case merely by affixing an 'interference' label to one of his duplicate claims.  Thus, [plaintiff's] FMLA violation allegations should be analyzed as a retaliation claim.").[9]

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."  *Lichtenstein*, 691 F.3d at 302.  Thus, in cases like this one, where there is an absence of direct evidence of retaliation, courts utilize the *McDonnell-Douglas* framework.  *Id.*

Under that framework, Shelley has the initial burden of demonstrating a *prima facie* case of retaliation.  *Id.*  "To do so, [Shelley] must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of [his] retaliation claim: (a) invocation of an FMLA right, (b) termination, and (c) causation."  *Id.* (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004)).

The Department contends that the court does not need to look beyond the first *McDonnell-Douglas* step because Shelley cannot establish causation, in that the investigation which led to his termination began before Shelley submitted his FMLA application.  (Doc. 30, pp. 7, 8–9.)  Relatedly, the Department argues that

---

[9] In their briefs, the parties also do not differentiate between the two claims.  (Docs. 30, 34, 38.)

Shelley cannot show causation because he has no evidence to demonstrate that Secretary Hassell or Baldo knew about Shelley's FMLA application.  (*Id.* at 9; *see* Doc. 30, p. 3.)  In opposition, Shelley focuses exclusively on the temporal proximity between the invocation of his FMLA rights and the adverse action taken by the Department.  (Doc. 34, p. 5.)

The time between Shelley applying for FMLA benefits and his termination is only two days (May 8–9, 2019).  This timeframe is certainly brief and falls within the "unusually suggestive" range for temporal proximity.  *See*, *e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (concluding that the plaintiff demonstrated a *prima facie* retaliation claim given that only two days lapsed between the protected conduct and adverse action).  Thus, at the *prima facie* stage, the court accepts that a reasonable juror could conclude that the timing alone establishes an inference of causation.  In kind, because the Department does not raise challenges to other elements, a reasonable juror could conclude that Shelley satisfies the first step under the *McDonnell-Douglas* framework.

Because Shelley satisfies his initial burden, under the second *McDonnell-Douglas* step, the Department must "present a legitimate, non-retaliatory reason for having taken the adverse action" against Shelley.  *Boykins*, 772 F. App'x at 156 (citing *Daniels*, 776 F.3d at 193).  This burden is "relatively light."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  Here, the Department's asserted

reasons for terminating Shelley from employment turn on "multiple work rule violations," including the loans that he gave to Watson and "e-mail activity at work." (Doc. 30, p. 10.) The reasons are also supported by record evidence. The Department further insists that neither Secretary Hassell nor Baldo were aware of Shelley's FMLA application when they respectively acted to terminate Shelley's employment from the Department. (*See* Doc. 38, p. 3.) And Shelley does not challenge whether the Department has satisfied this part of the burden-shifting framework. Accordingly, the court finds that a reasonable juror could conclude that the Department satisfies its burden at the second step. However, the court's analysis is still not complete.

Under the third step of the *McDonnel-Douglas* framework, Shelley must provide evidence from which a reasonable factfinder could infer that the Department's proffered justification was pretext for retaliation, i.e., "that 'the [Department's] proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Boykins*, 772 F. App'x at 156 (quoting *Daniels*, 776 F.3d at 193 (internal citation omitted)). In other words, Shelley must "point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the [Department's] articulated legitimate reasons; or (2) believe that a[] [retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

Shelley offers that the "unusually suggestive" temporal proximity alone demonstrates pretext. (Doc. 34, pp. 6, 7.) Shelley also attacks the stated reasons for the Department's decision to terminate him from employment. In that regard, Shelley contends that he did not charge interest on the loan he gave to Watson, send excessive e-mails, engage in excessive non-work-related activities during work hours, or fail to file or pay his Pennsylvania personal income taxes. (*Id.* at 7.) In reply, the Department returns to its causation arguments. (*See* Doc. 38, pp. 1–3.)

Drawing all inferences in Shelley's favor, it is certainly conceivable to the court that his FMLA application and discussion with Cost about the same served as a catalyst in the decision to terminate Shelley's employment. Notably, Shelley's employment was terminated one day after he submitted the FMLA application, but more than two months after the Inspector General issued the report in the Watson investigation and more than two months after the Department terminated Watson. Thus, the timing is certainly suspect. But the analysis cannot end here.

As argued by the Department, Shelley does not point to evidence to suggest that the individuals who made the decision to terminate his employment knew about the FMLA paper work or his meeting with Cost. And Shelley does not respond to this argument in his brief. Absent such evidence, no reasonable juror could conclude that the temporal proximity alone permits an inference of

retaliatory animus or motive at this third step.  *See also Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 308–09 (3d Cir. 2015) (acknowledging that temporal proximity may be sufficient to show pretext, but, despite the one-day proximity in the case, concluding based on other record evidence that the temporal proximity "would not provide a reasonable juror a basis to conclude that the timing [was] unusually suggestive of retaliatory animus[.]").

Likewise, without evidence of the decision makers' knowledge of his FMLA paper work, no reasonable juror could conclude that the Department's proffered reasons for the adverse employment decision was pretext for retaliation.  Indeed, a plaintiff cannot establish retaliation "without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels*, 776 F.3d at 197 (citations omitted).  The evidence, moreover, must permit an inference beyond speculation. *See id.*  At this step, given Shelley's failure to point to evidence demonstrating knowledge or awareness on part of the decision makers, the court finds that the Department is entitled to summary judgment on Shelley's FMLA claims.

## 2.  The Wrongful-Termination Claim

Finally, considering judicial economy, convenience, and fairness to the litigants, the court, in its discretion, is permitted to decline the exercise of supplemental jurisdiction over state-law claims if the court has dismissed the

claims over which it had original jurisdiction.  *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (citations omitted).  The court finds that no extraordinary circumstances exist to exercise supplemental jurisdiction over Shelley's remaining state-law claim in Count III of the complaint.  Because Shelley's federal claims over which this court had original jurisdiction shall not be permitted to proceed to trial, the court, in its discretion, declines to exercise supplemental jurisdiction over his state-law claim against the Department.  *See also* 28 U.S.C. § 1367(c)(3) (authorizing a district court to decline to exercise supplemental jurisdiction over a state-law claim when the court has dismissed all claims over which it has original jurisdiction).  Consequently, Shelley's state-law claim for wrongful termination will be dismissed without prejudice.  *See Kach*, 589 F.3d at 650 ("If a district court decides not to exercise supplemental jurisdiction and therefore dismisses state-law claims, it should do so without prejudice, as there has been no adjudication on the merits.") (citation omitted).

## CONCLUSION

For the foregoing reasons, the court will grant the Department's motions for summary judgment.  (Docs. 20, 22.)  The court will further award judgment for the Department in the Watson case and with respect to Counts I & II in the Shelley

case.  Regarding Count III in the Shelley case, the court will dismiss the state-law claim without prejudice.  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: June 29, 2020